IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 10–cv–02696–MSK–KMT

GEBHARDT EUROPEAN AUTOS, LLC D/B/A PORSCHE OF BOULDER,

      Plaintiff,

v.

PORSCHE CARS OF NORTH AMERICA, INC.,

      Defendant.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

**Kathleen M. Tafoya**
**United States Magistrate Judge**

      This case comes before the court on Plaintiff's "Motion for Preliminary Injunction" (Doc. No. 2, filed November 4, 2010. Defendant filed its Response on November 15, 2010 (Doc. No. 20), and Plaintiff filed its reply on July 28, 2009. (Doc. No. 20.) This court held an evidentiary hearing on the motion on November 23 and December 1, 2010. (Doc. Nos. 28, 33.) The parties filed supplemental briefs on December 8, 2010. (Doc. Nos. 34, 35.) This matter is ripe for review and recommendation.

## I.   BACKGROUND

      Plaintiff Gebhardt European Autos, LLC ("GEA") is a motor vehicle dealer operating Porsche franchise in Boulder, Colorado. (Prelim. Inj. Hr'g Tr. ("Tr.") 77:8-20; Doc. No. 11, First Am. Verified Compl. ("Compl."), ¶¶ 1, 26.) Defendant Porsche Cars of North America

("PCNA") is the exclusive authorized U.S. distributor of Porsche vehicles, parts, and accessories.  (Tr. 380:4-19.)  GEA is owned by James Gebhardt ("Gebhardt") (who has a 51% interest) and Lyle Chapman ("Chapman") (who has a 49% interest).  (Tr. 77:8-20; Ex. 2.)

In February 2006, GEA entered into an asset purchase agreement with Adolph Stammler ("Stammler") to purchase the Porsche dealership in Boulder, Colorado for $750,000, plus certain physical assets.  (Tr. 82:13-23; 84:1-16.)  In March 2006, Gebhardthardt and Chapman submitted applications to PCNA in connection with their proposal to operate the Porsche dealership in Boulder.  (Tr. 268:22-269:25; 277:10-15; 289:14-21; Exs. RRRR and SSSS.)  In their applications, Gebhardt and Chapman proposed to invest between $1.3 and $1.5 million to renovate the facility at 3150 28th Street in Boulder to provide a showroom, service reception area, and parts boutique built to PCNA's specifications.  (Tr. 269:3-270:11; Exs. RRRR and SSSS.)

In June 2006, PCNA and GEA entered into a letter of intent (the "LOI") under which PCNA agreed to appoint GEA as a Porsche dealer in Boulder subject to the express condition that GEA would, among other things, provide an exclusive showroom for its Porsche operations that met all of PCNA's requirements.  (Tr. 204:15-206:9; 383:8-384:20; Ex. B.)  GEA specifically acknowledged in the LOI that its facility did not "meet the facility requirements as defined in the [PCNA] Dealer Operating Standards."  (Tr. 205:24-206:9; Ex. B.)  PCNA and GEA also entered into a Porsche Cars North America, Inc. Dealer Sales and Service Agreement in June 2006 (the "Dealer Agreement").  (Tr. 210:4-11; Ex. 2.)  The Dealer Agreement incorporates the terms and conditions of the LOI.  (Tr. 390:11-391:6; Ex. 2.)  The Dealer

Agreement goes on to reflect GEA's commitment, in "consideration of [PCNA's] agreement to appoint [GEA] as an authorized Porsche dealer," to "provide an exclusive Porsche showroom which meets Porsche Corporate Identity and space requirements and be open for business in the new showroom by July 31, 2007."  (Tr. 391:7-392:6; Ex. 2.)  The Dealer Agreement also contains a provision entitled "Termination for Failure of Performance," which states that, if GEA fails to meet its facility obligations, PCNA may–following notice and an opportunity to cure–terminate the Dealer Agreement:

> If [PCNA] determines that Dealer has failed … to provide adequate Dealership Facilities, [PCNA] shall provide dealer with specific goals or performance standards with which dealer must comply.  If dealer fails to comply with the goals or performance standards over a period of not less than one hundred eighty (180) days . . . [PCNA] may terminate this Agreement by giving Dealer notice thereof . . . .

(Ex. A to Compl. at 49, § L.3; *see also id.* at 14, § A.4.)

GEA identified 3150 28th Street in Boulder as its proposed facility location, with 3146 28th Street to be a temporary showroom.  (Tr. 88:4-8.)  GEA talked with PCNA representatives about the facility and the potential of the location, which was owned by the former VW dealer, William Dick, and from whom Gebhardt Automotive held a 30 year lease.  (Tr. 282:2-13.)  The location had space available to put Porsche in its own showroom and, initially, GEA put Porsche in its own showroom, with 3500 square feet, and three offices.  (Tr. 88:1-3.)  Porsche of Boulder commenced operations in the summer of 2006.  (Tr. 88:4-6.)

In January of 2007, PCNA renewed the Porsche of Boulder Dealer Agreement for another year, in order to allow GEA time to address the facility.  In the Spring of 2007, Porsche

of Boulder submitted a site plan and related documents to PCNA addressing renovation of the

facilities at 3150 and 3146 28th Street.  (Tr. 92:11-13, 15-21.)  There were numerous meetings,

conversations and communications in 2007 between Gebhardt, Bruce Downing (GEA's

architect), the City of Boulder, and PCNA concerning building plans for the Porsche showroom

and related items.  (Tr. 96-98; Ex 5.)  Porsche of Boulder and the City of Boulder advised PCNA

that the City of Boulder would not allow Porsche of Boulder to proceed with plans proposed to

Porsche for developing the 28th Street location, after numerous communications, because the

property had an easement where GEA intended to build the new Porsche showroom.  (Tr. 97.)

GEA remained serious about building the showroom for Porsche, and their architect continued to

work with the City of Boulder in late 2007 to revise the plans for the building at 28th Street

which would meet the approval of the City.  (T 98-99; Ex. 6.)

In January 2008 PCNA again renewed the Porsche of Boulder Dealer Agreement.  PCNA

indicated its approval of Porsche of Boulder's sales performance, which had doubled the sales of

the former dealer, and provided Porsche of Boulder with incentive bonus money.  (Tr. 100-101,

Ex 7.)  In 2008, Porsche of Boulder began to plan for a showroom to be located at their VW

dealership site, where a pod was available for a showroom, along with other resources.  (Tr.

101:15-25.)  Porsche of Boulder proposed to PCNA to locate the Porsche showroom on that pod,

and went to the City of Boulder with that proposal in or about.  (Tr. 102.)  Porsche of Boulder

presented plans to PCNA, including a site plan.  (Tr. 102-103; Ex. 8.)  GEA also procured space

for Porsche service.  (Tr. 103.)  VW and Porsche approved physically sharing a service building

as long as a brick wall existed between service bays.  (*Id.*)  Further into the discussions, GEA

4

secured another piece of property with about 5,000 square feet for Porsche service.  (Tr. at 103-104.)  Still further in the discussions PCNA and Porsche of Boulder discussed the specifics of curb cuts, show room, and the service write up location with the City on a weekly basis.  (Tr. At 105.)  Additionally, Porsche of Boulder continued to have discussions with PCNA regarding construction of the showroom at the VW site as well throughout 2008.  (Tr. 107:5-8.)

GEA tried to secure a loan for both VW and Porsche construction costs, and went to several different lenders.   (Tr. 108:5-9.)  Initially VW Credit agreed to consider the loan package but thereafter the funds to be loaned dropped below the level needed to build the Porsche showroom.  (Tr. 108:13-18.)   Later in 2008, a significant economic downturn began in the United States, and GEA was unable to secure funding to construct the Porsche showroom. (Tr. 108-110.)

In January 2009, PCNA again extended Porsche of Boulder's Dealer Agreement another year.  (Tr. 110; Ex. 11.)  At that time, PCNA and GEA entered into a formal amendment to the Dealer Agreement in accordance with which GEA promised to, among other things, provide PCNA plans for its Porsche facility by March 1, 2009, and to complete construction of the facility by December 31, 2009.  (Tr. 226:19-227:13; Ex. 11.)  In January 2009, Porsche of Boulder changed architects, and met further with PCNA and its architects to discuss a showroom design, seeking to identify requirements and reduce the costs of the showroom, to make the project more feasible in light of the then-prevailing economic conditions.  (Tr. 111-112, Ex. 12.) GEA leased space for Porsche service and prepared architectural renderings of that space as

Porsche service.  (Tr. 112:20-113:5, Ex. 13.)  Porsche of Boulder proposed several different

configurations to PCNA for the showroom and service facilities.  (Tr. 114-115, Ex. 14.)

In mid-2009, PCNA replaced the field representative who had been working closely with

GEA on the facility situation with Ms. Tracy King, a new representative.  (Tr. 120.)  In

September 2009, King met with Gebhardt and Chapman at the dealership, at which time they

discussed options for facilities and toured potential locations for the Porsche showroom,

including a former Chrysler showroom, an upscale used car facility, and a former Honda store.

(Tr. 120, 123-25.)  After a couple of follow-up meetings, PCNA and GEA settled on a plan to

renovate the location at 28th Street.  (Tr. 126.)   King and PCNA expressed "serious concerns"

about Porsche of Boulder's proposal to scale down renovation in order to reduce costs, and

opined the remodel would cost nearly twice as much as GEA proposed to spend.  (Tr. 131; Ex.

16.)  GEA suggested that PCNA's requirements could be met with a reduced renovation which

still provided the Porsche Alucobond fascia, although the glass and channeling would be scaled

down to match existing construction and thereby reduce up to 50% of the cost.  (Tr. 132-33.)

By late 2009, PCNA was growing concerned about GEA's financial and operational

stability because (1) the dealership was capturing only thirty percent of the Porsche sales within

its own market (as compared to the sixty-to-seventy percent that an average Porsche dealer in a

similar market would capture) (Tr. 400:23-401:24); (2) GEA was having difficulty maintaining

floorplan financing (which is required under the Dealer Agreement and is necessary to purchase

Porsche vehicles from PCNA) (Tr. 405:7-406:8); (3) GEA had been operating at a loss for

several years (Tr. 59:2-7; 402:11-403:2); and (4) GEA was showing over $1 million in negative

owner's equity (Tr. 402:11-403:2).  In November 2009, King requested a meeting with Porsche of Boulder to address these concerns.  (Tr. 133; Ex. 16.)

On the morning of January 13, 2010, PCNA renewed Porsche of Boulder's Dealer Agreement for another year.  (Tr. 133-135.)  Later that morning, Mr. David Martin, the vice president of Porsche Cars North America, and Tracy King, PCNA's new field representative, visited GEA's dealership in Boulder.  (Tr. 135:12-15, 395:20-396:2.)  The purpose of the January meeting was to discuss both GEA's failure to provide its promised facility and to discuss the dealership's future.  (Tr. 411:15-23.)  In the meeting, Martin informed GEA that–based on its historically poor performance and profitability–it had two options, one of which was to voluntarily terminate the Dealer Agreement and invoke certain buy-back provisions in the contract.  (Tr. 396:15-397:1; 397:13-398:14; 404:5-17; 480:13-19.)  Martin also told GEA that, if it decided to not voluntarily to terminate the Dealer Agreement, its other option was promptly to provide PCNA with a specific plan to meet its obligations under the Dealer Agreement, so as to, among other things, provide a Porsche facility meeting PCNA's Corporate Identity program. (Tr. 412:5-16.)

In the January 2010 meeting, GEA informed PCNA that it was in discussion with two potential purchasers for the dealership: Joel Towbin and Sill-TerHar Motors.  (Tr. 138:7-139:6; 354:5-11.)  PCNA informed GEA that it could propose to sell its dealership so long as it obtained PCNA's approval of the purchaser pursuant to the terms of the Dealer Agreement.  (Tr. 412:17-413:14.)  PCNA also told GEA that merely discussing potential purchasers did not relieve GEA of its obligations to honor its commitments under the Dealer Agreement.  (Tr.

7

422:11-423:3.) PCNA informed GEA at the January 2010 meeting that it planned to send GEA a formal cure notice under the Dealer Agreement relating to GEA's breaches of the parties' agreement.  (Tr. 413:15-24.)

On February 1, 2010, Gebhardt responded to the meeting and the options, advising Martin that GEA planned to seek a buyer and, as a backup, was exploring options to combine the Porsche franchise with their existing BMW dealership.  (Tr. 142-43; Ex. 19.)  On February 2, 2010, Martin responded and indicated that although normally PCNA required a Buyer's Assistance Letter, he would dispense with that formality, provided Gebhardt confirmed in a return email his permission to discuss the sale with prospective buyers.  (Tr.146; Ex. 20.) However, Martin agreed also to consider efforts to provide a compliant Porsche showroom, provided they happened very quickly.  (Tr. pp.142; Ex. 20.)

On February 22, 2010, PCNA sent GEA a formal cure notice under the Dealer Agreement (the "Cure Notice").  (Tr. 413:15-414:14; 416:12-417:7; Ex. 21.)  The Cure Notice outlined GEA's various breaches of the Dealer Agreement, among them GEA's continuing failure to meet its facility commitment. (*Id.* at 1-3.)  Pursuant to Section L.3 of the Dealer Agreement, the Cure Notice gave GEA 180 days to cure its breaches, warning that the Dealer Agreement could be terminated for failure to cure or make substantial progress towards curing those breaches.  (*Id.* at 4.)  The Cure Notice required GEA either to (1) confirm, by March 1, 2010, its intention to sell its Porsche dealership and thereafter submit a proposed transfer to PCNA to be approved before the expiration of the 180-day cure period; or (2) confirm, by March 15, 2010, its intention to honor its facility obligation under the Dealer Agreement and thereafter

provide plans with specific milestones for providing a Porsche-compliant facility.  (Tr. 417:15-420:9; Ex. 21.)

After receiving the Cure Notice, GEA acknowledged to PCNA that its performance since it was appointed as a dealer was "unsatisfactory" and that (1) its sales within its own market were "far below market share"; (2) its "[f]ixed operations [had] under achieved its [sic] potential"; (3) its "[m]anagement turnover [had] eroded continuity and customer loyalty"; and (4) it "lack[ed] progress toward [its] facility upgrade commitment." (Tr. 236:25-240:10; Ex. AAA.)  On March 1, 2010, GEA sent PCNA a letter stating, among other things, that it planned to find a buyer for its Porsche dealership.  (Tr. 423:14-424:5; Ex. JJ.)

GEA made several attempts to find a buyer for its dealership.  (Tr. 316:25-318:18; 321:18-22; 325:9-16; 326:12-16; 333:6-18; 336:3-12.)  After issuing the Cure Notice, PCNA repeatedly told GEA, including in letters dated March 24 and June 14, 2010, that the notice remained in effect and that GEA had not cured the deficiencies identified in the Cure Notice. (Tr. 308:8-309:12; 427:3-14; Exs. 27 and 30.)  According to its First Amended Verified Complaint, after receiving the Cure Notice, GEA focused on trying to complete the sale of its dealership that it had discussed during the January 2010 meeting with PCNA.  (Tr. 304:21-306:4; Compl. ¶ 17.)

On August 24, 2010, PCNA sent GEA a written notice of termination (the "Termination Notice"), stating that the Dealer Agreement would terminate effective sixty days from GEA's receipt of the letter.  (Tr. 338:8-339:7; Ex. 35.)  As grounds for such action, the Termination Notice cited GEA's failure to cure its numerous breaches of the Dealer Agreement, including

GEA's ongoing failure to provide the dealership facility it had committed to as a condition of its appointment as an authorized Porsche dealership in 2006. (*Id.*.)  The Termination Notice was delivered to GEA on or about August 25, 2010.  (Tr. 338:8-11.)

On September 8, 2010–approximately two weeks after PCNA served the Termination Notice–GEA submitted an asset purchase agreement to PCNA proposing to sell its Porsche dealership to Sill-TerHar Motors for $987,501 (including $925,000 for "goodwill").  (Tr. 336:8-12; Ex. JJJJ.)  The proposed transfer to Sill-TerHar was to take effect by no later than November 30, 2010.  (*Id.*)  GEA had began discussions about the Sill-TerHar transaction prior to its January 2010 meeting with PCNA, executed an asset purchase agreement with Sill-TerHar in May 2010, which was amended in June 2010 and September 2010.  (Tr. 138:7-12; 187:13-22.) GEA waited, however, to submit the proposed transfer to PNCA until after it received the Termination Notice. (Tr. 336:8-12; Ex. JJJJ.)

On September 15, 2010, PCNA wrote to GEA noting its position that, because of the pendency of the Termination Notice, GEA no longer had "any right to transfer its assets with any expectation that the proposed purchase would become an authorized Porsche dealer."  (Tr. 427:23-428:5; Ex. 39.)  PCNA further stated that it was "willing to accept [the proposed transfer] as a settlement proposal" from GEA relating to PCNA's Termination Notice. (*Id.*)  PCNA also stated, however, that it was not "waiving any provision of [the Termination Notice]" and that "[u]nless and until" PCNA formally approved the proposed transfer, GEA "should not act in anticipation of the Proposal being approved . . . ." (*Id.*)  Sill-TerHar Motors did not complete a PCNA application prior to the expiration of the sixty-day period set forth in the Termination

Notice.  (Tr. 429:1-430:3.)  Specifically, at the time the Termination Notice became effective,

PCNA had not received proof that Sill-TerHar could obtain floorplan financing and Sill-TerHar

had not submitted a business plan to PCNA detailing how it planned to operate its proposed

Porsche dealership. (*Id.*)

On October 26, 2010, PCNA notified GEA that the sixty-day period set forth in the

Termination Notice had expired and that the Dealer Agreement was terminated.  (Tr. 430:4-10;

Ex. 41.)  PCNA also informed GEA that Sill-TerHar Motors had "not submitted all documents

necessary for us to make a determination" about whether the proposal was acceptable and that,

because the Dealer Agreement had been terminated, PCNA would no longer consider the Sill-

TerHar Motors proposal.  (*Id.* at 2.)

**II.      LAW**

Plaintiff requests injunctive relief pursuant to Fed. R. Civ. P. 65, seeking an order

reinstating Plaintiff's Porsche franchise and enjoining PCNA from instituting or taking any

action to terminate Plaintiff's franchise to sell and service Porsche motor vehicles during the

pendency of this action.  (Mot. at 6.)

To obtain a preliminary injunction, a plaintiff must show:

(1) a substantial likelihood of success on the merits; (2) irreparable harm to the
movant if the injunction is denied; (3) [that] the threatened injury outweighs the
harm that the preliminary injunction may cause the opposing party; and (4) [that]
the injunction, if issued, will not adversely affect the public interest.

*Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).  Here, Plaintiff

seeks an injunction directing PCNA to "reinstat[e] [its] franchise retroactively."  (Doc. No. 2-1.)

11

The Tenth Circuit has held that an order of reinstatement creates a mandatory injunction. *Schrier v. Univ. of Colo.* 427 F.3d 1253, 1261 (10th Cir. 2005). Mandatory injunctions that would disturb, rather than preserve, the status quo, are "specifically disfavored"; a party seeking such an injunction bears a "heightened burden" to show that "the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (*en banc*), aff'd, 546 U.S. 418 (2006). "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

## III.   ANALYSIS

### A.   *Irreparable Harm*

It is well established that "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir.2004) (citations omitted). A plaintiff satisfies the irreparable harm requirement by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Purely speculative harm will not suffice, but "[a] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative" and will be held to have satisfied his burden. *Id.* (internal citations omitted). Further, in

12

determining this factor, the court should assess "whether such harm is likely to occur before the district court rules on the merits." *Id.*

Economic loss usually does not, in and of itself, constitute irreparable harm because such losses are generally compensable by monetary damages. *See Port City Properties v. Union Pac. R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008); *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). "Likewise, future losses, if they are quantifiable, do not constitute irreparable injury." *Mountain Medical Equip. Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 848 (D. Colo. 1984). Further, "[t]he purpose of a preliminary injunction is not to remedy past harm," *Schrier*, 427 F.3d at 1267, and injunctions are acutely inappropriate where a party is "largely responsible for [its] own harm," *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002).

## I.   *Loss of Business and Goodwill*

Plaintiff identifies the loss of the business represented by the Porsche franchise, and concomitant loss of the business' goodwill, as the irreparable harm that would befall if Porsche is not ordered to reinstate the franchise during the pendency of this litigation. Plaintiff primarily relies on *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970), in arguing that the threatened loss of a franchise business before the lawfulness of a termination can be determined constitutes irreparable harm sufficient to warrant injunctive relief. *Id.*, 429 F.2d at 1207 (having run the business for 20 years, family's loss of car dealership was not entirely measurable in monetary terms). However, in *Semmes*, unlike in this case, the plaintiffs intended to continue running their car dealership business. *Id.* Here, however, there is no dispute that GEA fully intended to sell its dealership. (See, e.g., Compl. ¶ 18.) GEA's claim that it will

13

suffer irreparable harm in the form of the lost future profits from the operation of a Porsche dealership is unfounded because GEA planned to sell its dealership and cease operations as a Porsche dealer.  Additionally, in *Semmes*, the dealership had been a Ford dealership in existence for twenty years, and the termination of the franchise would have effectively terminated the entire dealership.  Here, the relationship between GEA and PCNA was relatively short-lived, and Porsche of Boulder had never been profitable and had never been in full compliance with the terms of the Dealership Agreement.

On September 8, 2010, GEA requested that PCNA approve the sale of its Porsche dealership to Sill-TerHar.  The asset purchase agreement between Sill-TerHar and GEA called for Sill-TerHar to pay GEA $987,501, including $925,000 for GEA's "intangible assets."  (Tr. 336:8-12; Ex. JJJJ.)  The closing of the parties' transaction (and, thus, the cessation of GEA's Porsche operations) was to occur by no later than November 30, 2010.  (*Id.*)  Gebhardt testified both that PCNA should have approved the sale to Sill-TerHar and that, had the sale been approved, GEA would have closed

on the proposed transfer.  GEA has sued PCNA in this action for, among other things, "unreasonably refus[ing] to approve the sale" to Sill-TerHar. (*See, e.g.*, Compl. Counts III, IV, and VI).  Had PCNA approved the Sill-TerHar transfer, as GEA claims it should have, GEA would have ceased being a Porsche dealer by no later than November 30, 2010.

At the preliminary injunction hearing, GEA implied that the proposed sale of its dealership was not fully of its choosing and that had no choice but to find a buyer for its Porsche dealership after PCNA issued the Cure Notice.  However, even before the January 13, 2010,

meeting during which PCNA first told GEA that it was planning on issuing the Cure Notice,

GEA had discussed the possible sale of Porsche of Boulder with Sill-TerHar and Towbin.

Further, on February 1, 2010–three weeks before PCNA issued the Cure Notice–GEA

acknowledged, in writing, that its "current physical and financial structures" were deficient, and

thus GEA proposed to sell its franchise in lieu of curing such deficiencies.  (Ex. 19.)

Gebhardt also testified that during the course of 2010 he discussed the possible sale of

GEA's Porsche dealership with at least four different third parties.  Plaintiff argues that "the

valuation placed on the Porsche of Boulder franchise varies, depending upon the view of the

buyer" and that each of the proposed buyers identified by GEA placed a value on the frachise

different than the value Gebhardt placed on it.  (Doc. No. 35 at 19.)  However, Gebhardtardt

testified that third parties' valuations of GEA were very close to his valuation.  (*See* Tr. 359-60.)

Gebhardt also testified that third parties who have expressed an expression as to the value of

Porsche of Boulder since October 26, 2010, either matched or exceeded Gebhardt's opinion of

the value of the franchise.  (Tr. 360.)  In at least one case (i.e., Mr. Towbin's informal offer of

$1.4 million), the prospective buyer evidenced a willingness to pay more for the dealership than

GEA believed it was worth.  (Tr. 368.)

Since GEA was able to readily negotiate an arm's-length price for its Porsche dealership

(including the dealership's goodwill or "intangible" value), it is clear that the loss of GEA's

business and goodwill can be compensated by monetary damages.  GEA has not satisified the

irreparable harm requirement as to its goodwill by demonstrating "a significant risk that [it] will

experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co.*, 552 F.3d at 1210.

### ii.     Lost Value of Vehicle Sales and Continuing Warranty Work

Even if GEA had not planned to sell its Porsche dealership, the value of its future new cars sales and warranty operations can be calculated and effectively compensated with monetary damages.  GEA, like all Porsche dealers, is required to and has in fact kept detailed records of each sale and item of warranty work it has performed since GEA's inception in 2006.  (Tr. 58.) Such records include the amount of net profit that GEA derives from such sales and warranty work.  In the event that GEA prevails on its underlying claims against PCNA, this evidence provides a potential basis on which a damages award could be calculated.

In *Motor Werks Partners, L.P. v. BMW of North America, Inc.*, the court faced a similar issue in denying a motion for a preliminary injunction.  In that case, the plaintiff, a BMW dealer, sought an injunction ordering BMW of North America, Inc. ("BMWNA") to allow it to sell Mini Cooper-branded vehicles, which are also distributed by BMW.  *Motor Werks Partners, L.P. v. BMW of N. Am.*, No. 01 C 7178, 2001 WL 1607503, at *1–2 (N.D. Ill. Dec. 17, 2001).  Even though the dealer had no history of sales and service work upon which to premise a damages calculation (because it had never sold Mini Cooper vehicles) the court rejected the dealer's claim of irreparable harm noting that lost profits from its desired Mini Cooper operations were "eminently quantifiable based on BMWNA's allocations of Minis to other similarly situated dealers and likely profit margins."  *Id.* at *7.  The court also noted that "the revenue stream that a dealership is likely to earn from a new car buyer can be estimated and quantified to a degree

16

sufficient to permit a damage award." *Id.*  *See also Tri-State Generation & Transm'n Ass'n, Inc.*

*v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1361–62 (10th Cir. 1989) (The value of a "long

term [i.e., forty-three year] requirements contract may appear difficult to ascertain, especially

when requirements can vary considerably over a lengthy period of time, [but] we cannot say at

this time that the damages in this case cannot be calculated with a reasonable degree of

accuracy," given pertinent historical data together with related forecasts); *Fitzgerald v. Mountain*

*States Tel. & Tel. Co.*, 68 F.3d 1257, 1264 (10th Cir. 1995) ("[D]amages for lost business

opportunities need not be supported by mathematical certainty[;] they must be based on

reasonable proof.").

Here, if GEA were to prevail, its claim for damages would be readily ascertainable.

Messrs. Snyder and Martin testified that GEA has kept detailed records of its profits and losses

from sales and service.  Such records can potentially be used to calculate a damage award, if any.

Additionally, Porsche keeps monthly detailed reports for all its Porsche dealers.  (Tr. 405.)  It

would be rather simple to calculate losses based on similarly situated dealerships during the

same market conditions.  In fact, GEA attempted to prepare just such a calculation for the

preliminary injunction hearing.  (*See* Ex. 43.)  Therefore, the court finds that lost future warranty

work and car sales cannot support a finding of irreparable harm in this case.

**B.**     ***Success on the Merits***

Plaintiff also must show that he has a substantial likelihood of success on the merits of

his claim.  Plaintiff's Complaint alleges claims of: (1) Breach of Contract, Breach of the

Covenant of Good Faith, and violation of statute based upon the franchise termination; (2)

Breach of Contract, Breach of the Covenant of Good Faith and violation of statute based upon

the turndown of the proposed transfer; and (3) Promissory Estoppel.  Plaintiff aruges that "[f]or

at least some of these claims, Plaintiff has demonstrated a substantial likelihood of success on

the merits, even under the heightened scrutiny standard."  (Doc. No. 34 at 17.)

> ### i.   *"Just Cause" for Termination of Dealership Agreement*

Plaintiff first argues that the termination of the dealership violated the Colorado Dealer's

Day in Court Act, Colo. Rev. Stat § 12-6-120(1) (d), because PCNA did not have "just cause" to

terminate the franchise.  The statute provides that

> "just cause" shall be determined in the context of all circumstances surrounding the
> cancellation or nonrenewal, including but not limited to: . . . . The motor vehicle
> dealer's failure to provide adequate service of facilities, equipment, parts, and
> qualified service personnel; . . . [and] [t]he motor vehicle dealer's failure to
> substantially comply, in good faith, with requirements of the franchise that are
> determined to be reasonable and material.

Colo. Rev. Stat. § 12-6-120(1)(d)(I).  In this case, the Dealer Agreement also allows PCNA to

terminate GEA's franchise if the dealer fails to meet its facility and other obligations.  (*See*

Compl., Ex. A at 49, § L.3; 14, § A.4.)

GEA's facility commitments to PCNA were "material."  The parties' Dealer Agreement

itself states that GEA's facility commitment to PCNA provided the "consideration" for PCNA's

agreement to appoint GEA as a dealer in the first instance.  (*See* Compl., Ex. A at 3, § II).

Additionally, PCNA has described the importance of maintaining a consistent luxurybrand

image at all Porsche dealerships and has implemented a detailed CI program to advance that

goal.  (Tr. 381, 385.)

18

Courts have repeatedly held that (1) the obligation to establish a facility complying with the franchisor's standards is a material and substantial obligation of the franchise agreement, and (2) the breach of such an obligation, in and of itself, normally constitutes "just cause" for termination. *See, e.g., Autohaus, Inc. v. BMW of N. Am., Inc.*, No. CIV. A. 92-10403-MA, 1993 WL 1503945, at *8 (D. Mass. Dec. 23, 1993) (granting summary judgment and ruling that BMW "unquestionably acted with 'good cause' in terminating" a long-time dealer who failed to perform agreement to relocate to facility that complied with BMW's updated facility standards); *Maple Shade Motor Corp. v. Kia Motors of Am., Inc.*, 384 F. Supp. 2d 770, 777–78 (D.N.J. 2005); aff'd 260 F. App'x 517 (3rd Cir. Jan. 11, 2008) (granting summary judgment and concluding that dealer's failure to build a separate showroom for its Kia franchise, as it agreed to do when the franchise agreement was entered, constituted "good cause" for termination); *Wagner & Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc.*, 539 F. Supp. 2d 461, 470 (D. Mass. 2008), aff'd 547 F.3d 38 (1st Cir. 2008) (granting summary judgment upholding termination for dealer's failure to build facility that dealer promised at time it received franchise; facility breach constituted "good cause" for termination).

GEA concedes that its sales performance and facility "have not measured up to either GEA or PCNA standards." (Doc. No. 35 at 22.) Despite the fact that the Colorado statute contains a multi-factor test for termination, numerous courts have held (when interpreting other similar motor vehicle franchise statutes) that there is no need to consider other factors where, as here, PCNA has established just cause based on a material breach of the Dealer Agreement. *Id.*; *see also Chesapeake Ford, Inc. v. Ohio Motor Dealers Bd.*, 103 Ohio App. 3d 515, 521, 660

N.E. 2d 481, 485 (1995).  Thus, the court finds, in light of the evidence presented at the hearing, that Plaintiff has failed to demonstrate a reasonable likelihood of success on the merits of its claims, Counts I, II, or V, that PCNA did not have "just cause" to terminate the Dealer Agreement.

### ii.    Claims Related to Proposed Sale

Plaintiff's claims in Counts III, IV, and VI are related to the allegation that PCNA improperly failed to approve GEA's proposed sale to Sill-TerHar Motors.  Under well established case law, however, PCNA had no obligation to review the Sill-TerHar Motors proposal after the Termination Notice was issued.  "Every court decision addressing a franchisor's refusal to consent to a proposed transfer during the pendency of termination proceedings has come to th[e] conclusion" that such refusal was reasonable.  *Ganley v. Mazda Motor of Am., Inc.*, 367 F. App'x 616, 625–26, 2010 WL 697360, at *8 (6th Cir. 2010) (finding that manufacturer's rejection of transfer proposal made after receipt of notice of termination did not violate Ohio statute requiring "reasonable and objective criteria fairly and objectively applied," and collecting cases coming to the same conclusion under similar New Jersey, Virginia, Connecticut, New York, and Delaware franchise statutes).  This is so because, upon receipt of a notice of termination, "there [i]s little left [for a dealer] to transfer." *Portaluppi*, 869 F.2d at 248.

As GEA did not submit the proposed sale to Sill-TerHar Motors to PCNA until after the Termination Notice was issued, the court finds that GEA is not likely to succeed on its claims against PCNA for failing to approve that transfer.

20

### C.    Balance of Harms

Plaintiff also must show that any threatened injury to him does not outweigh the injury to the defendant under the preliminary injunction.  Plaintiff argues that the potential injury to GEA is terminal because the business will shortly cease, the customers will go elsewhere, and the employees will be terminated.  Plaintiff also argues that the value of the business as a going concern will be lost, with no prospect for recovery in the form of another Porsche franchise or another car franchise to replace it.

Defendant argues that an injunction would force PCNA to face the prospect of reinstating GEA's operations and allowing it once again to use its trademarks and to hold itself out to the public as authorized by PCNA to sell and service its vehicles.  PCNA makes no effort to quantify any harm that an injunction would cause it.  On balance, the court finds the injuries faced by Plaintiff outweigh the likely injuries defendant would suffer.

### D.    Public Interest

Plaintiff argues that it is in the public interest to grant the preliminary injunction in order to allow the dealership to continue to provide convenient customer service to Porsche of Boulder customers and other customers in the Boulder area.  It is not contested, however, that the Denver metropolitan area hosts other Porsche dealerships which could provide needed service and sales.  Plaintiff also argues that the injunction would allow the Plaintiff to avoid laying off employees.  Defendant argues that an injunction would require this Court to supervise a complex and troubled commercial relationship.  Defendant also argues that the reinstatement of GEA's Porsche operations could lead to public confusion with a dealership that is open one day, closed

the next, and then open again in the future.  None of these factors is particularly salient or

persuasive.  In the absence of any evidence–or even a compelling argument–that the proposed

injunction somehow harms the consuming public, however, this factor does not support granting

of the relief requested.

Accordingly, as Plaintiff has failed to satisfy the four prerequisites to obtaining a

preliminary injunction, this court respectfully

RECOMMENDS that  Plaintiff's "Motion for Preliminary Injunction" (Doc. No. 2) be

DENIED.

### ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may

serve and file written objections to the Magistrate Judge's proposed findings and

recommendations with the Clerk of the United States District Court for the District of Colorado.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A

general objection that does not put the district court on notice of the basis for the objection will

not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's

report and recommendation must be both timely and specific to preserve an issue for de novo

review by the district court or for appellate review."  *United States v. One Parcel of Real Prop.*

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to

make timely objections may bar *de novo* review by the district judge of the magistrate judge's

proposed findings and recommendations and will result in a waiver of the right to appeal from a

judgment of the district court based on the proposed findings and recommendations of the

magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review);  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 20th day of December, 2010.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge